UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION (DETROIT)

In re:

Moussa H. Musa and
Laureen Musa,

    Debtors.
_____/

Prescription Supply Inc. and
LTC Pharmacy, LLC,

    Plaintiffs,

v.

Moussa H. Musa and
Laureen Musa,

    Defendants.
_____/

Case No. 16-42476
Chapter 7
Hon. Mark A. Randon

Adversary Proceeding
Case No. 16-04497

**<u>OPINION AND ORDER: (1) GRANTING LAUREEN MUSA'S
MOTION FOR SUMMARY JUDGMENT; (2) DENYING IN PART MOUSSA
MUSA'S MOTION FOR SUMMARY JUDGMENT; AND (3) DENYING
WITHOUT PREJUDICE MOUSSA MUSA'S MOTION TO DISMISS</u>**

**I.    INTRODUCTION**

The failure of Advanced Pharmacy ("Advanced") created a personal financial crisis for Moussa "Mark" Musa, Advanced's part owner and guarantor of its $1.3 million business loan with Prescription Supply, Inc. ("PSI"). To address the outstanding debt, Mark and PSI negotiated a series of contractual agreements, through which: (1) PSI purchased Advanced's assets, including its accounts receivables; (2) Mark signed a six-

1

month employment agreement and promised to both assist in the transfer of Advanced's ongoing prescriptions to PSI's subsidiary, LTC Pharmacy, LLC ("LTC") and keep LTC's trade secrets and proprietary information confidential; and (3) Mark agreed not to start a competing pharmacy within a set geographical radius for three years.  In exchange, PSI agreed to release Mark from his personal guarantee–a promising resolution.  But things didn't go as planned: PSI and LTC ("Plaintiffs") eventually sued Mark for breach of the contracts and tortious interference; Mark and his wife, Laureen, jointly filed Chapter 7 bankruptcy.  Plaintiffs filed this adversary proceeding to have the debt determined non-dischargeable under sections 523(a)(2)(A), 523(a)(2)(B), and 523(a)(6); and have Mark and Laureen's discharge denied, in general, under sections 727(a)(2) and 727(a)(4)(A) of the Bankruptcy Code.

To avoid the principle that garden-variety contract claims are dischargeable in bankruptcy, Plaintiffs now allege that Mark induced them to enter the contracts through fraud.  Specifically, Plaintiffs claim that when Mark signed the agreements, he had already formed a would-be pharmacy–Care Home RX, Corp. ("Care Home")–to compete with LTC; he misrepresented Advanced's accounts receivables and outstanding co-pays; and, he lured Advanced's former customers away from LTC to Care Home.  All of this occurred with the alleged assistance of his co-conspirator, Laureen.

Mark and Laureen's individual motions for summary judgment are pending.  The Court heard argument on August 28, 2017, and has reviewed all of the respective briefs and exhibits.  For the reasons discussed below, the Court **GRANTS** Laureen's motion in

its entirety, as there is no evidence that she was a party to the contractual agreements or conspired with her husband. However, although the evidence on Plaintiffs' lynchpin claim that Mark had an ownership interest in Care Home is weak, the Court **DENIES IN PART** Mark's motion, because questions of fact remain.[1]

## II. BACKGROUND

PSI is a wholesale pharmaceutical distributor. LTC, a wholly-owned subsidiary of PSI, is a retail pharmacy that sells prescriptions to long-term care nursing facilities. Advanced was a competing pharmacy owned by Mark and his brother, Mohammad "Mike" Musa. Laureen worked for Advanced. On August 28, 2014, another competing pharmacy, Care Home, was formed.[2] There is no paper trail that connects Mark, Mike, or

---

[1]Mark also requested dismissal under Fed. R. Civ. P. 12(b)(6). "Technically, . . . a Rule 12(b)(6) motion cannot be filed after an answer has been submitted." *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990); *see also* Rule 12(b)(6) ("A motion asserting . . . [this] defense[] must be made before pleading if a responsive pleading is allowed."). However, after an answer is filed, the rules permit a motion for judgment on the pleadings. Fed. R. Civ. P. 12(c). Instead of filing a substantive response to Mark's motion, Plaintiffs requested an opportunity to do so, if the Court treats the motion as one under Rule 12(c). As such, the Court **DENIES WITHOUT PREJUDICE** Mark's motion to dismiss. Mark may inform the Court at the pretrial conference if he wishes to pursue a motion for judgment on the pleadings. If so, the Court will allow Plaintiffs the opportunity to file a substantive response.

[2]*See* MICHIGAN'S DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS, http://w1.lara.state.mi.us/businessentitysearch/dt_corp.asp?id_nbr=05858H&name_entity =CARE%20HOME%20RX,%20CORP. (last visited September 13, 2017). Mahesh Pydipati is listed on Care Home's Articles of Incorporation. He is also listed as the Incorporator on Care Home's 2015 Annual Report; and as the President, Secretary, Treasurer, Director, and Authorized Officer or Agent on the 2016 Annual Report. In fact, paragraph 13 of Plaintiffs' state-court Complaint alleges that "Defendant Care Home was formed by Mahesh Pydipati, who resides in Columbus, Ohio, on August 28, 2014" (Dkt. #1, Ex. A at p. 5 (CM/ECF pagination)).

3

Laureen to Care Home.[3]

PSI supplied prescriptions to Advanced for several years. Advanced and PSI entered into a Credit Agreement; Mark signed a personal guaranty of Advanced's debt. At some point, Advanced fell insurmountably behind on its payments, and the parties attempted to work out a deal.

Two things happened on July 20, 2015: (1) Advanced signed an Asset Purchase Agreement ("APA") in which PSI agreed to purchase Advanced's assets for $300,000.00; and (2) Mark signed an Employment Agreement to work for LTC for at least six months. PSI agreed to extinguish Advanced's debt of over $1.3 million–and Mark's personal guaranty–if the agreements were fulfilled. Plaintiffs assert that Mark failed to keep his end of the bargain and damaged LTC's business in the process.

On January 22, 2016, Plaintiffs filed a Complaint in the United States District Court for the Northern District of Ohio against Mark, Mike, Laureen, and Care Home, alleging breach of contract, tortious interference with business relationships, misappropriation of trade secrets, unfair competition, breach of fiduciary duty, business defamation, amounts owed on account, unjust enrichment, breach of personal guaranty, conversion, conspiracy, and seeking declaratory relief. Mark's Employment Agreement

---

[3]Care Home filed a Chapter 7 bankruptcy petition on March 31, 2017 (Case Number 17-44733). Pydipati is listed as the President; and the Statement of Corporate Ownership indicates that "[t]here are no entities that directly or indirectly own 10% or more of any class of the debtor's equity interest" (Dkt. #3). The Statement Regarding Authority to Sign and File Chapter 7 Petition indicates that Pydipati is "the only shareholder of 100% interest in Care Home RX, Corp" and that he is "the sole owner of the Corporation" (Dkt. #8).

was terminated concurrently with the filing of the Complaint.

One month later, Mark and Laureen filed Chapter 7 bankruptcy. On the deadline set for objecting to discharge, Plaintiffs filed this adversary proceeding seeking a determination that the debt is non-dischargeable under section 523, and seeking to deny Mark and Laureen's discharge under section 727.[4]

## III. STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7056, summary judgment must be granted "if the movant shows that there are no genuine issues as to any material fact in dispute and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *CareToLive v. Food & Drug Admin.*, 631 F.3d 336, 340 (6th Cir. 2011). The standard for determining whether summary judgment is appropriate is whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Pittman v. Cuyahoga County Dep't of Children Services*, 640 F.3d 716, 723 (6th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

The Court must draw all reasonable inferences in favor of the party opposing the motion. *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 676 (6th Cir. 2011). However, the

---

[4]The United States Trustee also filed an adversary proceeding seeking to deny Mark and Laureen's discharge under section 727. The U.S. Trustee subsequently dismissed the proceeding (Case Number 16-04496).

nonmoving party may not rely on mere allegations or denials, but must "cit[e] to particular parts of materials in the record" as establishing that one or more material facts are "genuinely disputed." Fed. R. Civ. P. 56(c)(1). A mere scintilla of evidence is insufficient; there must be evidence on which a jury could reasonably find for the non-movant. *Hirsch v. CSX Transp., Inc.*, 656 F.3d 359, 362 (6th Cir. 2011).

## IV. ANALYSIS

### A. *Laureen's Motion for Summary Judgment*

Plaintiffs' Complaint challenging the dischargeability of the debt as to Laureen, and her general denial of discharge, relies upon this Court's opinion in *Szachta v. Thompson (In re Thompson)*, No. 15-04775, 2016 WL 1055582 (Bankr. E.D. Mich. March 15, 2016). There, the Court found that an attorney's officer manager was a co-conspirator in a scheme to misappropriate client settlement proceeds: she was a signatory on the bank account, routinely transferred money between accounts, and made false representations to clients regarding their settlement proceeds. There is no evidence that Laureen's involvement with Care Home was even remotely similar to the office manager's role in *Thompson*.[5]

Laureen is dismissed from this adversary proceeding.

---

[5] Laureen's only connection to Care Home was that she was employed as a billing and filing technician from October 2015 through April 2016.

### B. Exceptions to Discharge Under 11 U.S.C. § 523

#### 1. 11 U.S.C. § 523(a)(2)(A)

11 U.S.C. § 523(a)(2)(A) excepts from discharge "debt[s] for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by[] false pretenses, a false representation, or actual fraud[.]" To except a debt from discharge under section 523(a)(2)(A) due to a false representation, Plaintiffs must prove:

> (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss.

*Rembert v. AT&T Universal Card Services (In re Rembert)*, 141 F.3d 277, 280-81 (6th Cir. 1998). Garden-variety contract claims are dischargeable in bankruptcy. *Brian Plushanski Constr. Co. v. Aaroe (In re Aaroe)*, No. 11-1180 (RTL), 2011 WL 2886312, at *7 (Bankr. D.N.J. July 14, 2011).

Plaintiffs argue that Mark made three misrepresentations when he signed the Employment Agreement: (1) he would assist in transferring Advanced's prescriptions to LTC, and continue to fill the prescriptions; (2) he would keep LTC's proprietary information confidential; and (3) he would not compete with LTC during his employment and for three years after his employment.

A review of the evidence shows that Mark, indeed, transferred prescriptions from Advanced to LTC. For example, Kathleen Davis, the Administrator for Excelsior Home, testified at her deposition that Mark told her to use LTC as her pharmacy:

7

> Q: Your affidavit states that in or around July of 2015[,] Mark and Mike informed Excelsior that Advanced Home Care Pharmacy would no longer be doing business but would be merging with LTC Pharmacy.
>
> \* \* \*
>
> Q: Did Mark or Mike tell Excelsior Home to use LTC as–after the merger?
>
> A: Yes. Yes.
>
> Q: And you did, in fact, use LTC for the pharmacy needs?
>
> A: Hm-hmm. Yes.

(Dkt. #80, Ex. 5 at pp. 26, 28). While there is evidence that Mark later encouraged Excelsior Home (and possibly other long-term nursing facilities) to switch from LTC to Care Home, that fact fails to establish fraud in the inducement.[6] At least at the outset, Mark kept his promise to get Advanced's customers to use LTC for their pharmaceutical needs.

Plaintiffs' second alleged misrepresentation also fails as a matter of law: there is also no evidence that Mark did not keep LTC's trade secrets and proprietary information confidential.

However, the Court finds that–when viewed in a light most favorable to Plaintiffs–there is a genuine issue of material fact regarding whether Mark made a misrepresentation in his promise not to compete with LTC. Although the lynchpin of many of Plaintiffs' claims rest on their allegation that Mark had an ownership interest in

---

[6]*See, e.g.*, Davis' deposition at pp. 38, 48 (Dkt. #80, Ex. 5).

Care Home, there is no supporting paper trail. Instead, Plaintiffs' evidence, such that it is, relies largely on the testimony of Davis. For example, she testified at her deposition:

> Q: Paragraph six also says, quote, Mark Musa stated that they formed Care Home RX. When were you told that?
>
> A: I don't remember. It was a little while.
>
> Q: But it was Mark?
>
> A: Yes, I believe it was Mark.
>
> \* \* \*
>
> Q: And you told the person on the phone [at LTC] that Mark Musa and Mike Musa told you that they weren't working for LTC anymore?
>
> A: Right. Yes.
>
> Q: And you also told the person that they told you that they opened Care Home?
>
> A: Hmm? Pardon me?
>
> Q: It says, "I advised him that Mark Musa and Mike Musa told me that they were no longer working for LTC Pharmacy and that they had opened a new pharmacy called Care Home RX."
>
> A: Oh, yeah. Yes.
>
> Q: That is correct?
>
> A: Yes.
>
> \* \* \*
>
> Q: Your affidavit states, "Excelsior Home's main contacts at Care Home RX were Mark and Mike."
>
> A: Yes.

9

> Q: Is that correct?
>
> A: Yes.
>
> Q: So when you wanted to deal with Care Home, you called Mark or Mike?
>
> A: Yes.

(Dkt. #80, Ex. 5 at pp. 36-39).

While this evidence is weak, it is sufficient to create a question of fact only as to whether Mark fraudulently misrepresented that he would not compete with LTC.

### 2. 11 U.S.C. § 523(a)(2)(B)

Under section 523(a)(2)(B), Mark is not discharged from:

> any debt[] for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by[] use of a statement in writing[] that is materially false; respecting the debtor's or an insider's financial condition; on which the creditor to whom the debtor is liable for such money . . . reasonably relied; and that the debtor caused to be made or published with intent to deceive[.]

Schedule 7.1(e)(1) is a written document attached to the APA. In that document, Mark represented that as of May 2015, Advanced had outstanding accounts receivables in the amount of $111,025.70. Mark also estimated that Advanced would receive an additional $40,695.15 from outstanding co-pays. Based upon these figures, Mark represented the current anticipated accounts receivables total to be $151,720.85 (Dkt. #78, Ex. 3 at p. 38 (CM/ECF pagination)).

There is a question of fact regarding whether the amount of the outstanding co-pays was materially false. *See Flagstar Bank, FSB v. Stricker (In re Stricker)*, 414 B.R.

10

175, 181-82 (Bankr. W.D. Mich. 2009) ("A [financial] statement is materially false if the information offers a substantially untruthful picture of the financial condition of the debtor that affects the creditor's decision to extend credit.") (Citation omitted). The evidence shows that Advanced did not charge its customers co-pays. *See e.g.*, the deposition testimony of Cynthia Rivers, the Office Manager for Hudson Home:

> Q: Your affidavit states that Advanced Home Care Pharmacy would waive co-pays on prescriptions?
>
> A: Yes.
>
> Q: And that's true?
>
> A: Yes.
>
> \* \* \*
>
> Q: Did Hudson Home residents ever receive invoices from Advanced–
>
> A: No.
>
> Q: –trying to collect–
>
> A: Nothing.
>
> Q: –co-pays?
>
> A: No.

(Dkt. #80, Ex. 6 at p.16); *see also* Davis' deposition (Dkt. #80, Ex. 5 at pp. 21-22). If the witnesses' testimony is accurate–and Advanced did not charge its customers co-pays–a trier of fact could determine Mark's statement that Advanced was expecting $40,695.15 in outstanding co-pays was materially false.

There is also a question of fact regarding whether the amount of outstanding

accounts receivables was materially false. Mark testified at his deposition that Maple Manor sent Advanced a $12,000.00 per-diem check, but it could not be located:

> Q: Do you remember there was an issue where someone was looking for about a $12,000 check for co-pays from one of your accounts at Advanced?
>
> A: It wasn't co-pays, it was per diem check that Maple Manor had not yet paid to Advanced. It was the last per diem check.
>
> \* \* \*
>
> Q: Do you know if it was ever sent?
>
> A: Yeah, it was sent.
>
> \* \* \*
>
> Q: Well, how do you know it was sent[?]
>
> A: Well, Marcus [Evangelista] had told me that he had sent it.

(Dkt. #80, Ex. 4 at pp. 46-47). However, at his deposition, Evangelista (the General Counsel for Maple Manor) denied any knowledge of the check (Dkt. #80, Ex. 7 at pp. 72-73). If the mysterious $12,000.00 check was included in the outstanding receivables–when Advanced was not actually owed that amount from Maple Manor–a trier of fact could determine Mark's statement that Advanced was expecting $111,025.70 in accounts receivables was materially false.

Schedule 7.1(e)(1) is a document respecting Advanced's (an insider's) financial condition.[7] *See Bank Iowa-West Des Moines v. Torres (In re Torres)*, 457 B.R. 13, 19

---

[7] "The term 'insider' includes–if the debtor is an individual–corporation of which the debtor is a director, officer, or person in control[.]" 11 U.S.C. § 101(31)(A)(iv).

(S.D. Iowa 2011) (accounts receivable report, profit and loss statement, and balance sheet are written statements concerning the debtor's or an insider's financial condition).

Reasonable reliance is a factual determination to be made by a trier of fact based on the totality of the circumstances. *Bank One, Lexington, N.A. v. Woolum (In re Woolum)*, 979 F.2d 71, 75 (6th Cir. 1992). Section 7.1 of the APA states:

> As a material inducement to Buyer to enter into this Agreement and to consummate the Closing Transactions contemplated hereby, Seller Parties hereby make the representations and warranties set forth in this Article[:]
>
> \* \* \*
>
> (k) <u>Accounts Receivable</u>. Schedule 7.1(e)([1]) attached hereto sets forth a complete list of all accounts receivables as of June 15, 2015. All accounts receivable are valid receivables representing sales actually made in the Ordinary Course, subject to no known setoffs or counterclaims, are current, and are, to the best of Seller's knowledge, collectible.

(Dkt. #78, Ex. 3 at pp. 14, 18 (CM/ECF pagination)). Plaintiffs assert that they relied on Mark's representations within the APA, and would not have signed the document without those representations. A trier of fact could find Plaintiffs reasonably relied upon the total amount of outstanding receivables in signing the APA.

Finally, the intent to deceive element does not require a subjective intent to have another person rely on false financial documents. Rather, this element is satisfied if "a debtor is reckless when submitting financial statements that he knows are not true." *Investors Credit Corp. v. Batie (In re Batie)*, 995 F.2d 85, 90 (6th Cir. 1993). The Court finds that questions of fact are raised with respect to the truthfulness of Mark's

13

representations in the APA, and, consequently, his intent to deceive.

### 3.  11 U.S.C. § 523(a)(6)

11 U.S.C. § 523(a)(6) provides that debts for "willful and malicious injury by the debtor to another entity" are non-dischargeable. This section only applies to acts done with actual intent.

Plaintiffs allege that Mark diverted LTC's customers and prescriptions to Care Home. Mark admits that a question of fact exists as to this issue. However, there is no evidence that Mark failed to keep LTC's trade secrets and proprietary information confidential.

### C.  *General Denial of Discharge under 11 U.S.C. §§727(a)(2) and 727(a)(4)(A)*

Plaintiffs argue that Mark should be denied a discharge under 11 U.S.C. §§727(a)(2) and 727(a)(4).

Section 727(a)(2) allows denial of discharge if "the debtor, with intent to hinder, delay, or defraud a creditor . . . has . . . concealed–(A) property of the debtor, within one year before the date of the filing of the petition; or (B) property of the estate, after the date of the filing of the petition[.]"

Section 727(a)(4)(A) allows denial of discharge if the debtor "knowingly and fraudulently, in or in connection with the case[] made a false oath or account[.]"

Plaintiffs contend that Mark should be denied a general discharge under section 727(a)(2) because he concealed: (1) four corporations, formed with Mike; (2) his interest

14

in Care Home; and (3) two $2,500.00 payments Mike sent him in connection with the sale of an automobile repair business. They contend Mark should be denied a general discharge under section 727(a)(4)(A) because he affirmatively misrepresented his interest in Care Home at the 341 Meeting of Creditors.

The Court finds that Mark's failure to initially disclose his interest in four shell corporations is of no moment for two reasons: (1) it was an inadvertent omission–Mark amended his schedules to include the corporations; and (2) the corporations were valueless. *See McDermott v. Schwartz (In re Schwartz)*, No. 13-4622-PJS, 2015 WL 1010490, at *6 (Bankr. E.D. Mich. March 3, 2015) (if the false information is the result of mistake or inadvertence, the debtor remains entitled to a discharge) (quoting *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 685-86 (6th Cir. 2000)); *see also Crews v. Topping (In re Topping)*, 84 B.R. 810, 842 (Bankr. M.D. Fla. 1988) ("Where assets of some substantial value are omitted from the schedules, the conclusion that they were omitted purposefully with the fraudulent intent to conceal the assets in question may be warranted. Only where the non-disclosed assets were of little or no value will such fraudulent intent not be imputed.") (Citation omitted); *Lewis v. Summers (In re Summers)*, 320 B.R. 630, 645 (Bankr. E.D. Mich. 2005) (section 727(a)(2)(A) generally suggests that the property concealed have some value).

Plaintiffs also fail to present any evidence to rebut Mark's contention that he spent the $5,000.00 long before the bankruptcy petition was filed.

The only issues that survive summary judgment are whether Mark had an

15

16-04497-mar    Doc 89    Filed 09/15/17    Entered 09/15/17 11:56:18    Page 15 of 16

ownership interest in Care Home, failed to schedule it as an asset, and affirmatively denied such interest at the 341 meeting, all in violation of sections 727(a)(2) and 727(a)(4)(A).

## V. CONCLUSION

The Court **GRANTS** Laureen's motion in its entirety, as there is no evidence that she was a party to the contractual agreements or conspired with her husband

However, though the evidence on some claims is tenuous, the Court **DENIES IN PART** Mark's motion, because certain questions of fact remain. Specifically, the following issues will go to trial:

1. 11 U.S.C. § 523(a)(2)(A) solely as to whether Mark fraudulently misrepresented that he would not compete with LTC, because he had an ownership interest in Care Home;

2. 11 U.S.C. § 523(a)(2)(B) solely as to whether Mark made a false written statement regarding Advanced's outstanding accounts receivables and co-pays;

3. 11 U.S.C. § 523(a)(6) solely as to whether Mark diverted LTC's customers and prescriptions to Care Home; and

4. 11 U.S.C. §§727(a)(2) and 727(a)(4)(A) solely as to whether Mark had an ownership interest in Care Home, failed to schedule his interest, and misled his creditors at the 341 meeting regarding his ownership interest.

**IT IS ORDERED**.

**Signed on September 15, 2017**      /s/ Mark A. Randon
                                      **Mark A. Randon**
                                      **United States Bankruptcy Judge**